AO 243   (Rev. 2/95)

MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

| **United States District Court** | District of Massachusetts |
|---|---|

| Name of Movant Charlie Webb | Prisoner No. 23742-038 | Case No. 01-10267 WGY |
|---|---|---|

| Place of Confinement |
|---|
| USP Allenwood Box 3000 White PA 17887 |

| UNITED STATES OF AMERICA | v. | Charlie Webb (name under which convicted) |
|---|---|---|

## MOTION

1. Name and location of court which entered the judgment of conviction under attack   USDC D. Mass

   1 Courthouse Way Boston Mass 02210

2. Date of judgment of conviction   6/19/02

3. Length of sentence   288 Months

4. Nature of offense involved (all counts)   Felon in Possession of a firearm
   and armed career criminal

5. What was your plea?  (Check one)
   (a) Not guilty   ☑
   (b) Guilty   ☐
   (c) Nolo contendere   ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   Not Applicable

6. If you pleaded not guilty, what kind of trial did you have?  (Check one)
   (a) Jury   ☑
   (b) Judge only   ☐

7. Did you testify at the trial?
   Yes   ☐   No   ☑

8. Did you appeal from the judgment of conviction?
   Yes   ☑   No   ☐

(2)

AO 243   (Rev. 2/95)

9. If you did appeal, answer the following:

   (a) Name of court   _Court of Appeals for the first Circuit (DK# 02-1811)_

   (b) Result   _Conviction was affirmed_

   (c) Date of result   _7/22/03 Rehearing denied, 7/29/03 Mandate Issued_

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any federal court?

    Yes ☐    No ☑

11. If your answer to 10 was "yes," give the following information:

    (a) (1) Name of court   _Not Applicable_

        (2) Nature of proceeding   _____

        (3) Grounds raised   _____

        _____

        _____

        _____

        _____

        (4) Did you receive an evidentiary hearing on your petition, application or motion?
            Yes ☐    No ☐

        (5) Result   _____

        (6) Date of result   _____

    (b) As to any second petition, application or motion give the same information:

        (1) Name of court   _____

        (2) Name of proceeding   _____

        _____

        (3) Grounds raised   _____

        _____

        _____

        _____

        _____

(4)   Did you receive an evidentiary hearing on your petition, application or motion?

     Yes ☐    No ☐

(5)   Result _____

(6)   Date of result _____

(c)   Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?

    (1)   First petition, etc.      Yes ☐    No ☐

    (2)   Second petition, etc.    Yes ☐    No ☐

(d)   If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

12.   State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

    CAUTION: If you fail to set forth all grounds in this motion, you may be barred from presenting additional grounds at a later date.

    For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

    Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)   Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b)   Conviction obtained by use of coerced confession.

AO 243    (Rev. 2/95)

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e) Conviction obtained by a violation of the privilege against self-incrimination.
(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g) Conviction obtained by a violation of the protection against double jeopardy.
(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(i) Denial of effective assistance of counsel.
(j) Denial of right of appeal.

A. Ground one: Whether Petitioner was deprived of Ineffective Assistance of Counsel when trial Counsel failed to Impeach witnesses?

Supporting FACTS (state *briefly* without citing cases or law): Please See 20-Page Appendix for Supporting facts (pages 1-16)

B. Ground two: Whether the district Court's 4 point enhancement to Petitioner's base offense level violates Washington v. Blakely?

Supporting FACTS (state *briefly* without citing cases or law): Please See 20-Page Appendix for Supporting facts (pages 16-17)

C. Ground three: Whether illegal State convictions were used to Incorrectly adjust Petitioner's base offense level and Criminal History Category?

Supporting FACTS (state *briefly* without citing cases or law): Please See 20-Page Appendix for Supporting facts (pages 17-19).

AO 243    (Rev. 2/95)

D.  Ground four: _____

Supporting FACTS (state *briefly* without citing cases or law): _____

13.  If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them: _____

Defense Counsel, for ground one, could not be expected to raise ineffective assistance against herself. The second ground could not be foreknown as Blakely hadn't issued by the Supreme Court, and the state convictions had not yet been under attack in state Court.

14.  Do you have any petition or appeal now pending in any court as to the judgment under attack?
Yes ☐    No ☐

15.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a)  At preliminary hearing  Syrie Fried Fed. Defender's Office
408 Atlantic Avenue Boston Mass 02110

(b)  At arraignment and plea  Same as 15 (a)

(c)  At trial  Same as 15 (a)

(d)  At sentencing  Same as 15 (a)

AO 243    (Rev. 2/95)

(e)  On appeal  *Same as 15(a)* _____

_____

(f)  In any post-conviction proceeding _____

_____

(g)  On appeal from any adverse ruling in a post-conviction proceeding _____

_____

16.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
     Yes ☐     No ☑

17.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
     Yes ☐     No ☑

     (a)  If so, give name and location of court which imposed sentence to be served in the future: _____

     _____

     _____

     (b)  Give date and length of the above sentence: _____

     _____

     (c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
          Yes ☐     No ☐

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

10 | 18 | 04
_____
Date

*Charley M. Ubli*
_____
Signature of Movant

(7)

APPENDIX OF CHARLIE WEBB'S § 2255 MOTION

12.  State concisely every ground on which you claim that
     you are being held in violation of the constitution,
     laws or treaties of the United States.  Summarize
     briefly the facts supporting each ground.

A.  Ground One:

     Whether Petitioner Charlie Webb was deprived of effec-

tive assistance of counsel under constitutional standards

when trial counsel did not effective and fully impeach

government witnesses with a Boston Police Incident Report?

     Supporting Facts:

     At trial defense counsel did not effectively and fully

impeach government witnesses with a Boston Police Incident

Report which was authored by the arresting officers.   In

addition, defense counsel's inadequate cross examination

of the authenticity of the report led to its preclusion

of being offered into evidence for the jury's consideration

in assessing the crediability of the main three witnesses.

     I.  The Report

     The Boston Police Report provided the following infor-

mation:

          Suspect #2 Gillenwater, Eugenia 01-19-71
          013587824 126 Westview St #4 Dor Ma B/N
          female blue shirt tan pants, blk sandals.
          About 1:50 AM PO McCarthy while at the
          front desk of Area B-2 did receive a tele-
          phone call directing him to Zeigler St at
          Orchard Park for a report of a domsetic
          dispute outside a black Ford Explorer.

APPENDIX -- Page 1

Caller did refuse to identify himself.  PO
McCarthy along with PO R. Lewis assigned
to the B02A did immediately respond to the
area.  While travelling on Zeigler St. in
Orchard Park POs did observe both suspects
arguing loudly in a verbal dispute near
MA Reg 795-6JF, Black Ford Explorer.  PO's
at this time did stop and exit their  dep't
M/V.  PO's did observe SP #1 standing to the
right of suspect #2 as PO McCarthy  approached
he did observe SP #1 turn quickly toward SP #2.
At this time PO McCarthy observed a metallic
object in SP #1's right hand.  SP #1 then
made a furtive movement which his right hand
toward SP #2's waistband.  SP #1 was observed
placing the sliver metallic object within
SP #2's waistband.PO's for officer safety
did conduct a pat frisk of both suspects.
SP #1 at this time became very irate and
did try to pus away from PO's McCarthy.
PO Lewis while conducting a pat down
frisk of SP #2 did feel  what he believed
to be a butt of a handgun within SP #2's
waistband.  Recovered from SP #2's waist-
band recovered from SP #2's waistband by
PO Lewis was one 9 MM Serial # TDN63300
Taurus Handgun metallic in color.  Con-
tained within the handgun was (1) one
round in the chamber and (8) eight more
contained  within the clip, which was
also contained in the gun.  The B452
Paillant did respond and assist Officers
at this time.  The B904 Sgt Bailey re-
sponded and assisted both suspects placed
under arrest at this time.  SP #1 trans-
ported to Area B02 by B03A.  SP #2 trans-
ported to Area B2.  While at Area B02 SP #2
did state to SGT Bailey 'He's been harass-
ing me all night.'  SP #2 further stated to
SGT Bailey 'It happen so fast.  He turned and
stuck the gun in my pants.'  SP MV towed by
Always Open #8241 BPD Form 2012 completed.
Tow line notified # 099516.  Firearm placed
and secured in district gun locker by B906
SGT Merner ADA Machera Notified.

(See Boston Police Incident Report, marked as E1 and E2,
dated 08/05/00).

APPENDIX -- Page 2

II.  Testimont of Officer McCarthy

On direct examination, Police Officer McCarthy testi-
fied that he is employed by the city as a police officer
for over five years.  On August 5, 2000, he stated he was
assigned to Bravo 203, which is a police patrol wagon, a
transport wagon.  Assigned to Bravo 203 slso was Police
Officer Lewis (See tt 59, Vol II, 12/18/01).

Officer McCarthy said on August 5, 2000, at approxi-
mately 1:50 A.M., he received a call at the station, and
he and Officer Lewis responded to that call travelling
to  Zeigler Street in Roxbury.  He added that he was
the driver of the police vehicle (Id.).  As they travelled
along Zeigler Street past a black Ford Explorer on his
right side, he saw a woman and a man off to the right on
the curb arguing very loudly (See TT. 60, Vol II, 12/18/01).
They stood  to the right of the front bumper facing Dear-
born Street (See TT. 61:13).  Officer McCarthy stated
that he drove by them and took a left on Dearborn Street,
took another left on Eustis Street, then a left on Wheat-
ley Street travelling around the block completely.  Officer
McCarthy parked the vehicle in the intersection facing
toward them (See TT. 62:19 through 63:1-4).

Officer McCarthy,told the jury that thesubjects were
later identified as Charlie Webb and Eugenia Gillenwater
(See TT. 62:6-13).  Conerning his observations of them,

APPENDIX -- Page 3

he said Gillenwater was standing with her back toward him, and he could see Webb in front of her off to the right, (See TT. 63:25), allowing him to only see his face and shoulders as Gillenwater obstructed the point of view (See TT. 65). He descirbed Zeigler Street as being 20 feet wide with townhouse on the right side and a build-ing development on the left side with parking available only on the right side of the street (See TT. 60).  As he drove around the block and came up Wheatley, he could observe them on Zeigler Street still arguing with one another (See TT. 63).

For lighting conditions of the location Wheatley and Zeigler Streets both have overhead streetlighting. He pulled into the intersection and parked on Zeigler, the front of the police vehicle on Zeigler (See TT. 64).

Next, he stepped out of the vehicle and continued toward them making eye contact with Webb who held in his right hand a large sliver matellic object.  Webb, with two hands, took the object and spun towards Gillenwater's waist (See TT. 67).  With his hands, he  put the object in her waistband and  pushed it down into her pants (See TT. 68). He again stated that the lighting conditions of the area was very bright, adding that the headlights on the patrol wagon are higher than a normal patrol car; plus, there was an overhead lamp directly over Webb and Gillenwater

(See TT. 68).  Exterior lighting on the buildings made vis-
ability in the area very easy.  (See TT. 69).

When he reached Webb, he grabbed his two hands and spun
him toward the Ford Explorer.  At that point, Webb resisted
by pushing away from him (Id.).  Other police units arrived
to assist them.  Officer Pallant, who was working Bravo 452
that night, assisted McCarthy with taking Webb to the ground
(See TT. 70).

The government then showed Officer McCarthy a handgun
which he described  to be a nine millimeter Taurus hand-
gun that was recovered from the waistband of  Gillenwater
(See TT. 71).  Next, he stated the handgun was similar
to the object he saw in Webb's right hand  (See TT 72).

Finally the government ellicited from him how he pre-
pared a police report following the incident which indicated
the location as 111 Zeigler Street  (See TT. 72), but he
could not recall where he got the information of 111
Zeigler Street that he put on that police report (See TT 72).

On Cross examination, Officer McCarthy admitted that
he knew the area well as his whole tour of duty as a police
officer has been there in B2 (See TT. 75).

Officer McCarthy acknowledged that there were plenty
of automobiles parked on the right side of Zeigler Street
on that day at two o'clock in the morning (See TT 76), that
between his patrol wagon and where they were standing on

the sidewalk were a bunch of cars, and that he could only
see of them what it is possible to see over a line of parked
cars between his vehicle and them on the sidewalk (See TT.
81).Because there was no daylight, he was relying on arti-
fical lighting.  Therefore, the only light came from street-
lights and lights on some of the houses  (See TT. 82).  He
did not stop when he first saw them (Id.) * or have his
emergency lights going but just the headlights were  on
(Id.)

    He also acknowledged that after the incident he wrote
a report in which he reported the location where he arrested
Webb and Gillenwater as being in front of 111 Zeigler Street.
he agreed that the police officer needs to be a good obser-
ver and historian to accurately document  the chain of events
during an arrest of subjects (See TT. 83-35).  And he also
said that since he was the first officer on the scene, the
responsibility to write a report would fall on him describ-
ing what happen (Id.).

    On cross examination, Officer McCarthy gave the follow-
ing responses to these questions:

---

    *    The incident report stated that McCarthy stopped
the police vehicle immediately and exited it.

APPENDIX -- Page 6

Q. That's right. You were on the scene for a little while anyway before you went back to the station?

A. Oh, absolutely.

Q. And you had plenty of time to look around and see where you were, didn't you?

A. We did.

Q. Okay. And you know that neigborhood, right?

A. I know it fairly well, correct.

Q. Okay. And you know the difference between being in the middle of the block and being opposite an intersection, right?

A. I do, I do.

Q. Okay. And you know there's a big difference between sort of being in the mouth of an intersection and being halfway down the block, right?

A. I do, ma'am.

Q. It looks different, doesn't it?

A. Absolutely.

Q. Okay. And in fact --

    Ms. Fried: Could I see Chalk A again,, your Honor, please. All right, Thank you.

Q. With respect to this Chalk -- well let me just ask you. Do you see on Chalk A that there is a box on the left side of, the lower left corner of the Chalk which carries two numbers, hand-written numbers 109 and 111?

A. I do.

Q. Okay. And do you know that that box with those numbers represent.a residence --

A. Ido.

Q. --bearing that address? bearing two addresses?

APPENDIX -- Page 7

A.   I do.

Q.   Okay.  That is the residence that's immediately
     west of 115/117 Zeigler Street?

A.   That's correct.

Q.   Okay.  Well, first of all, you do acknowledge
     that when you wrote your report on this you wrote
     in you report, and you'll have to beg, I'll have
     to beg your pardon here, you wrote that this
     happened here, didn't you?

A.   I do acknowledge that I did write that.

     *                    *                    *

Q.   All right.  And there is no streetlight in front
     of 111 Zeigler, is there?

A.   There's no streetlight in front of 111.

     *                    *                    *

Q.   Okay, into the intersection, the front of your
     car, it was on Zeigler Street, Correct?

A.   Correct.

Q.   Okay.  So for you to go from here to 111 you
     have to get out of your car, go around it, and
     come down Zeigler past 115/117, don't you?

A.   Absolutely.

Q.   Okay.  And there's a big difference between doing
     that and getting out of your car and going straight
     to the corner where there's a streetlight, isn't
     there?

A.   Oh, there is.

(See TT. 86:19   through 89:8)


                    APPENDIX -- Page 8

Defense counsel wanted to have the police report put into
evidence and thus moved the district court to voir dire
Officer McCarthy concerning the correctness of his report
in relation to the area it noted as the place of occurrence
of the incident:

> The Court:     All right.  So what's your position
>                about the police report and where it
>                says the incident happened?
>
> The witness:   What's my position as to where it hap-
>                pened.  In the police report I noted
>                that it happen at 111 Zeigler Street.
>
> The Court:     And is that right?
>
> The Witness:   That's incorrect.
>
> The Court:     And so your testimony today is what?
>
> The Witness:   That it was 117 Zeigler Street.

(See TT 107:25 through 108:9).*

---

    *     This testimony of the incorrectly writen report
disqualified it from being put into evidence by the defense.
Defense counsel was ineffective because she did not effect-
ively and fully use the report to impeach the witness on the
accuracy of the report.  Specifically the narrative section
of the report corroborated that the report was correctly
written in regard to the proximity of Webb and Gillenwater
in front of 111 Zeigler Street.  Officer McCarthy wrote
"while travelling on Zeigler Street in Orchard Park POs
did observe both suspects arguing loudly in a verbal dis-
pute near MA Reg 795-6JF, Black Ford Explorer.  PO's at
this time did stop and exit their dep't M/V."  (See Boston
Police Incident Report marked as E1 and E2)(emphasis added).
The report does not mention anything about them travelling
around the block, but it provides that they stopped [on
Zeigler Street] and exited their vehicle.

APPENDIX -- Page 9

III.  Testimony of Gillenwater

On direct examination, Eugenia Gillenwater testified that after Webb, her boyfriend, chased her on foot, the pursuit -- which began in front of his Ford Explorer ended in the same spot -- on Zeigler Street where a side street came out (See TT 120).  At that point, Webb argued loudly with her.  The government asked four questions to which Gillenwater responded as follows:

Government:     Okay.  Where were you in relation to his car?

Gillenwater:    I was in front of it.  Like my back was toward him, toward the door of his car.

Government:     And were you on the street or the side-walk?

Gillenwater:    The street.

Government:     I'm sorry.  You were -- I'm sorry. The street and sidewalk there?

Gillenwater:    The street.

Government:     The street.  And what kind of car was this?

Gillenwater:    It was a two door black Ford Explorer.

(See TT 120:22 through 121:1-3)    She also testified that at some point a police wagon drove by them slowly (See TT. 121) and that it did not have no lights on, it was totally dark.*  The police wagon got to the end of Zeigler Street

---

*     Officer McCarthy testified that the patrol wagon headlights were on at all times, excluding the emergency equipment.

and it turned left. The next time she saw the vehicle it came quickly up a side strret (See TT 122). And its bright lights caused her to turn in that direction and look (See TT 123-125). The government continued to probe this area, asking:

> Q.  Okay, now what happened at that point?
>
> A.  At that point as the wagon approached, ah, I was wearing draw string pants, Charlie pulled my pants and dropped the gun into my pants.

(See TT. 125:13 & 125:18-20).[*] She then testified that she put her hands in the air as the officers approached them.[**] She was directed by one officer to put her hands on the truck where he pulled the gun out of her pants (See TT 127).

On cross examination, Gillenwater was confronted with several of her arrests and convictions. In each case, she used a false identity but would not admit it was her plan to deceive the law enforcement or the judicial system.

---

[*]    Police Officer McCarthy testified that Gillenwater's back was toward him constantly while he approached them driving and runing. It is also important to note that she has the firearm being placed in her pants even before the wagon was parked.

[**]    Officer Lewis' testimony sharply contradicts this as he stated he had to push her hands away from her waistband in order to search her for a weapon.

IV.   Testimony of Officer Lewis

On direct examination, Police Officer Richard Lewis, a seven year veteran, said that he was assigned to the patrol wagon on August 5, 2000, along with Officer McCarthy (See TT. 108-109, Vol I, 12/17/01).  At approximately 1:50 A.M. on that day they were present at the Roxbury Police Station (See TT 109) when a service call came in. After he and his partner had a brief discussion about the call, they responded to Zeigler Street in Roxbury in Orchard Park (See TT 110).

He described Zeigler Street as a one wat, naroow street, approximately  20 feet wide with cars parked on one side due  to its size, its width.  They drove up Zeigler in the correct direction (See TT 112-113).  At the location there are houses on both sides of the street, and he recalled it was a clear, warm night (Id.).  The vehicle's emergency equipment was off (Id.).

At the intersection of Zeigler Street and Wheatley Way, he observed two individuals arguing to the right of the patrol wagon See TT 113-114). With the aid of a diagram Officer Lewis explained the area of that intersection identifying a lamp post and a driveway between 117 and 121 Zeigler Street  (See TT. 115).  He acknowledged that he was very familar with that neighborhood for seven

years (See TT 115). As they drove down Zeigler Street, he saw them by the corner of Zeigler and the driveway, and they were almost underneath rhe streetlamp. He later learned their identities as Charlie Webb and Eugenia Gillen-water (See TT. 115-116). He said he could faintly hear the argument because his window was partially opened, and their verbal dispute was accompanied by their hand jestures. There was cars parked along the side of the street and a black Ford Explorer was parked approximately at the streetlight where he saw Webb and Gillenwater (See TT 118). The government continued to ask questions in relation to his observations, elliciting:

> Q. Okay. Where did you go?
>
> A. At that point when we were approximately two car legths away from them that's the first time Mr., Mr. Webb and Ms. Gillen-water noticed us. They stopped their argument, turned, faced us and watched us as we drove past them. At that point we continued to the end of Zeigler Street, took a left on Dearborn Street.
>
> Q. Okay. What Happen thereafter?
>
> A. We proceeded around the block and came up Wheatley Street directly perpendicular to the suspect, the defendant and Ms. Gillen-water.

(See TT 119:9-19 Vol I, 12/17/01).*

---

\* The police report states that the police wagon stop immediately on Zeigler Street, a narrow-one way Street. (continued on next page).

APPENDIX -- Page 13

Officer Lewis testified that it took no more than 40 seconds to go around the block (See TT. 120). As they drove down Wheatley, the wrong way, they approached them and stopped the police vehicle in the middle of the intersection (See TT. 120). The front of the police vehicle was facing them, and the vehicle headlights were on (Id.). They left the vehicle at the same time and went toward them.

Gillenwater was leaning against the right bumper of the Ford Explorer (See TT. 123); Officer Lewis said he could see her left side and her back. Concerning the chain of reaction that took place as he approached them Leiws testified as follows:

> Q. When you say you saw her head snap to the left, to which direction was her head pointing at that point?
>
> A. Prior to snapping to the left she was facing Mr., Mr. Webb. When we were approaching from.
>
> Q. Okay. What happen after that?
>
> A. For a split second she looked at us. Simultaneously I observed Mr. Webb quickly turned in to Ms. Gillenwater and his hands moved into her waist-band. At the same time I observed Ms. Gillenwater look from her left in our direction, she immediately

---

\*    (Continued from previous page) The report makes no mention of a drive by and a drive around the block to come up Wheatley Street directly perpendicular to them. (See Two-Page Boston Police Incident Repport marked as E1 and E2).

APPENDIX -- Page 14

> looked down at her waist.  She
> had her hands in front of her
> at the same time at the time
> also.

(See TT. 123:4-16).[*]    Officer Lewis siad he grabbed

Gillenwater's pocketbook which was strapped across her

chest laying in front of her waistband (See TT. 125).

With his right hand, he touched her waist and felt what

he believed to be the butt of a handgun.  At that point

he knocked her arms away from the front of her and had her

place them on the hood of the Ford Explorer.[*]  He pro-

ceeded to remove the weapon from her waistband  (Id.).

Officer McCarthy  was assisted  with cuffing Webb by

arriving officers as Lewis disarmed the weapon  (See TT.

128-129).

On Cross examination, Officer Lewis stated that the

Police Incident Report, authored by Officer McCarthy, which

put the arrst location as 111 Zeigler Street was incorrect.

He further stated that at the request of the AUSA McNeil

that they returned to the arrest location a month before

the trial so as to refresh their memories.  This is when

they notified AUSA McNeil  that the arrest did not occur

---

[*]    However, Gillenwater testified that she threw
her hands into the air as the offocers approached them .

APPENDIX -- Page _15

at 111 Zeigler Street  (See TT. 135-142).; Lewis said that
111 Zeigler Street has no streetlight in front of it (See
TT. 141).  Defense counsel then showed Officer Lewis photo-
graphs, Exhibits B and D, of Zeigler Street; One photo being
a close up of 111 Zeigler Street, and the other photo being
a longer shotwhich showed more than one building.  Based
on the photos, which help his recollection, OfficerLewis
stated there is no streetlight in front of 111 Zeigler
Street  (See TT. 150-151).

### Relief Requested

Because Petitioenr Charlie Webb was deprived of effec-
tive assistance of counsel under constitutional standards
when trial counsel did not effectively and fully impeach
government witnesses with a Boston Police Incident Report,
the conviction must be vacated and a new trial ordered,
or, in the alternative, an evidentiary hearing must be
ordered in order to develop the record more fully on this
issue.

### B.    Ground Two:

Whether the district court's four point enhancement
to petitioner's base offense level, violated the law of
Washington v. Blakely recently announced by the United
States Supreme Court, requiring the indictment to charge
and the jury to decide such enhancements?

Supporting facts:

During the sentencing proceeding the district court
calculated the base offense level as follows:

> The Court: In this case, the base offense
> level is 24. I am adding four
> levels because the victim was
> threatened with a handgun and
> there was an assault with a dan-
> gerous weapon.

(See Sentencing transcript at 3). The indictment did not
charge Petitioner with this enhancement of his sentence
because the victim was threatened with a handgun and there
was an assault with a dangerous weapon.

In addition, the jury did not find Webb guilty of and
qualifying for this enhancement of the sentence because the
victim was threatened with a handgun and there was an
assault with a dangerous weapon.

Relief requested:

Wherefore, the district court's four point enhancement
to petitioner's base offense level, violated the law of
Washington v. Blakely requiring the district court to re-
sentence petitioner without the four point increase to his
base offense level, or, in the alternative, for an evident-
iary hearing to be held in order to further develop the re-
cord on this issue.

APPENDIX -- Page 17

C.    Ground Three:

Whether illegal state convictions were used to incorrectly adjust petitioner's base offense level and criminal history computation thereby subjecting him to a more severe sentence of imprisonment making him an armed career criminal?

Supporting Facts:

During the sentencing proceeding the district court held:

> The Court:    In this case, the base offense level is 24.  I am adding four levels  because the victim was threatened with a handgun and there was an assault with a dangerous weapon.  That gets us to 28.
>
> *              *              *
>
> You're absolutely right to raise it.  But lest there be any doubt, having presided here, I do find by a fair preponderance of the evidence that these calculations are correct and there was such an assault. Mr. Webb is an armed career criminal.  And so that gives his offense level as 34.
>
> His Criminal Histroy Category is V, which gives us a guideline range of not less than 262 nor more tan 327 months...
>
> Arithmetically, Mr. McNeil, are the guidelines properly calculated?

APPENDIX Page 18

Mr. McNeil:  I just think the court might have
             misspoken.  His criminal history
             is VI rather than V, you Honor, I
             just want to make that clear, based
             on the guideline calculation.

Ms. Fried:   Your Honor, if I might.  The pro-
             bation report--if the court is ap-
             plying the enhancement, the armed
             career criminal enhancement--

The Court:   Oh, I am and that's absolutely
             right.  I have to do that. I have
             to go to VI then.

(See Sentencing Tr. 3:9-12; 3:25 -4:1-21).  Subsequently
the court imposed upon the petitioner a 24 year sentence of
imprisonment, 288 months, being in the mid-range of cate-
gory VI at an offense level of 34.  (See Sent. Tr at 15).
The  state court convictions used to qualify petitioner as
an armed career criminal were illegal convictions.

    Relief requested:

    Wherefore, petitioner moves this court to hold this ¶
2255 proceeding in abeyance until he has his prior convict-
ions vacated so this court could then re-sentence him accord-
ingly.  (See Brackett v. U.S., 206 F.Supp2d 183 (D. Mass.
2002).

    I, Charlie Webb, hereby declare under penalty of per-
jury that the foregoing is true and correct.  Signed on this
18th day of October, 2004.

                          Charley Webb

                          Charlie Webb, pro-se
                          #23742-038 USP Allenwood
                          Box 3000 White Deer, Pa 17887

APPENDIX --Page 19

## CERTIFICATE OF SERVICE

I, Charlie Webb, hereby declare under penalty of perjury that a copy of the enclosed original and three (3) copies of my Section 2255 Motion were placed in the institutional mailbox for forwarding to this Court, pre-paid first class postage, on this 18th day of October, 2004.

Respectfully submitted,

Charlie Webb
#23742-038
USP Allenwood
Box 3000
White Deer, Pa 17887

APPENDIX -- Page 20

# BOSTON POLICE
# INCIDENT REPORT

ORIGINAL ☒   SUPPLEMENTARY ☐

| KEY SITUATIONS OTHERS | | | | COMPLAINT NO 000428529 | | REPORT DIST. B2 | | CLEARANCE DIST |
|---|---|---|---|---|---|---|---|---|
| TYPE OF INCIDENT FIREARM, POSSESSION | | CRIME CODE 0 | | STATUS | | DATE OF OCCUR. A.08/05/00 | | B. 08/05/00 |
| LOCATION OF INCIDENT 111 ZEIGLER ST | | | APT. | DISPATCH TIME 01:55 AM | | TIME OF OCCUR. A.01:50 AM | | B.01:50 AM |

| VICTIM-COMP. (LAST, FIRST, MI) COMM OF MASS | PHONE | SEX | RACE | | MARITAL STATUS |
|---|---|---|---|---|---|
| ADDRESS | APT. | OCCUPATION | | AGE 0 | D.O.B. |

| PERSON REPORTING PO MCCARTHY PO LEWIS | ADDRESS 135 DUDLEY STRET,,MA, | | APT. | PHONE (617)-343-4270 |
|---|---|---|---|---|

WAS THERE A WITNESS TO THE CRIME.

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | ☒ |
|---|---|---|---|---|---|---|---|
| | | | | | | RES: YES | NO |
| | | | | | | BUS: | |

NUMBER OF PERPETRATORS : 2 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME ☒ YES NO

**PERSONS**

| STATUS | NAME (LAST, FIRST, MI) WEBB, CHARLEY | | S.S. NO. 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 | BOOKING NO. 20000229602 | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|
| WARRANT NO. | ADDRESS 16 COLUMBIA RD,BROCKTON,MA,00000-0000 | SEX MALE | RACE BLACK NON-HISPANIC | AGE 29 | HEIGHT 6-00 | DOB 7/7/1971 |
| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) GRAY TEE SHIRT GRAY SWEAT PANTS WHT SNEAKERS | WEIGHT 160 | BUILD SLIM | HAIR BLACK | EYES BROWN | | |

| STATUS | NAME (LAST, FIRST, MI) GILLENWATER, EUGENIA | | S.S. NO. 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 | BOOKING NO. 000000000 | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|
| WARRANT NO. | ADDRESS 126 WESTVIEW ST,DORCHESTER,MA,00000-0000 | SEX FEMALE | RACE BLACK NON-HISPANIC | AGE 29 | HEIGHT 0-00 | DOB 1/19/1971 |
| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) BLUE SHIRT TAN PANTS, BLK SANDALS | WEIGHT | BUILD | HAIR | EYES | | |

CAN SUSPECT VEHICLE BE DESCRIBED ☒ YES NO

**VEHICLE**

| STATUS TOWED | REG. STATE MA | REG. NO. 7956JP | PLATE TYPE PAN | YEAR(EXP) 100 | MODEL EXPLORER |
|---|---|---|---|---|---|
| VEHICLE MAKE YEAR FORD - 1997 | VEHICLE NO. 1FMDU24E2VUD53861 | | STYLE SUV | COLOR(TOP-BOTTOM) BLACK - BLACK | |
| OPERATOR'S NAME | | LICENSE NO. | STATE | OPERATOR'S ADDRESS | |
| OWNERS'S NAME WARD TANISHA | | OWNERS'S ADDRESS 17 BRADLEE ST,DORCHESTER,MA,02124-0000 | | | |

CAN PROPERTY BE IDENTIFIED ☒ YES NO

**PROPERTY**

| STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|

IS THERE A SIGNIFICANT M.O. ☒ YES NO

**MO**

| TYPE OF WEAPON-TOOL GUN | NEIGHBORHOOD RESIDENCE/HOME | | TYPE OF BUILDING | PLACE OF ENTRY |
|---|---|---|---|---|
| WEATHER CLEAR | LIGHTING ARTIFICIAL | TRANSPORTATION OF SUSPECT FOOT | VICTIM'S ACTIVITY | |
| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR SEE NARRATIVE | | | RELATIONSHIP TO VICTIM | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE) ☒ YES NO

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW) ☒ YES NO

**BLOCK NO.** NARRATIVE AND ADDITIONAL INFORMATION

SUSPECT #2 GILLENWATER, EUGENIA 01-19-71 013587824 126 WESTVIEW ST #4 DOR MA B/N FEMALE BLUE SHIRT TAN PANTS, BLK SANDALS. ABOUT 1:50AM PO MCCARTHY WHILE AT THE FRONT DESK OF AREA B-2 DID RECEIVE A TELEPHONE CALL DIRECTING HIM TO ZEIGLER ST AT ORCHARD PARK FOR A REPORT OF A DOMESTIC DISPUTE OUTSIDE A BLACK FORD EXPLORER. CALLER DID REFUSE TO IDENTIFY HIMSELF. PO MCCARTHY ALONG WITH PO R. LEWIS ASSIGNED TO THE B203A DID IMMEDIATELY RESPOND TO THE AREA. WHILE TRAVELLING ON ZIEGLER ST. IN ORCHARD PARK PO'S DID OBSERVED BOTH SUSPECTS ARGUING LOUDLY IN A VERBAL DISPUTE NEAR MA REG 795-6JF, BLACK FORD EXPLORER. PO'S AT THIS TIME DID STOP AND EXIT THEIR DEPT M/V. PO'S DID OBSERVED SP #1 STANDING TO THE RIGHT OF SP #2 AS PO MCCARTHY APPROACHED HE DID OBSERVED SP #1 TURN QUICKLY TOWARD SP #2 AT THIS TIME PO MCCARTHY OBSERVED A METALLIC OBJECT IN SP #1'S RIGHT HAND. SP #1 THEN MADE A FURTIVE MOVEMENT WITH HIS RIGHT HAND. TOWARDS SP #2'S WRISTBAND. SP #1 WAS OBSERVED PLACING THE SILVER METALLIC OBJECT WITHING SP #2'S WAISTBAND. PO'S FOR OFFICER SAFETY DID CONDUCT A PAT FRISK OF BOTH SUSPECTS. SP #1 AT THIS TIME BECAME VERY IRATE AND DID TRY PUSH AWAY FROM PO'S MCCARTHY. PO R. LEWIS WHILE CODCUTING A PAT DOWN FRISK OF SP #2 DID FEEL WHAT HE BELIEVED TO BE A BUTT OF A HANDGUN. WITHIN SP #2'S WAISTBAND. RECOVERED FROM SP #2'S WAISTBAND RECOVERED FROM SP #2'S

WAISTBAND BY PO LWEIS WAS ONE 9 MM SERIAL #TND63300 TAURUS HANDGUN METALLIC IN COLOR. CONTAINED
WITHIN THE HANDGUN WAS (1) ONE ROUND IN THE CHAMBER AND (8) EIGHT MORE CONTAINED WITH IN THE CLIP,
WHICH WAS ALSO CONTAINED WITHIN THE GUN. THE B452 PAILLANT DID RESPOND AND ASSIST OFFICERS AT THIS
TIME. THE B904 SGT. BAILEY RESPONDED AND ASSISTED BOTH SUSPECTS PLACED UNDER ARREST AT THIS TIME. SP
#1 TRANSPORTED TO AREA B02 BY B203A. SP #2 TRANSPORTED TO AREA B2. WHILE AT AREA B02 SP #2 DID STATE TO
SGT BAILEY "HE'S BEEN HARASSING ME ALL NIGHT SP#2 FURTHER STATED TO SGT BAILEY" IT HAPPENED SO FAST
HE TURNED AND STOCK THE GUN IN MY PANTS SP MV TOWED BY ALWAYS OPEN #8241 BPD FORM 2012 COMPLETED.
TOW LINE NOTIFIED #099516. FIREARM PLACED AND SECURED IN DISTRICT GUN LOCKER BY B906 SGT.MERNER ADA
MACHERA NOTIFIED

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
| --- | --- | --- | --- | --- | --- |
| B203A | 1 | JOHN A McCARTHY | 11715 | 11332 | NO |
| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO. |
| 08/05/00 | AREA B-2 | | | | |
| TIME COMPLETED | PATROL SUPERVISOR NAME | | PAT. SUP. ID | DUTY SUP. NAME | DUTY. SUP. ID |
| 01:50 AM | | | | ROBERT M MERNER | 9771 |